## AMERICAN NAT. BANK OF DENVER v. NICHOLAS.

### No. 614.

District Court, D. Colorado, Sitting at Denver.

Dec. 16, 1943.

Fritz A. Nagel (of Pershing, Bosworth, Dick & Dawson), of Denver, Colo., for plaintiff.

Ivor O. Wingren, Asst. U. S. Atty., of Denver, Colo., for defendant.

SYMES, District Judge.

In this case the plaintiff, the American National Bank of Denver, has sued the Collector of Internal Revenue for this district to recover $5,728.50, the amount claimed for an overassessment of the plaintiff's income tax return for the calendar year 1938, the Commissioner having that year increased the net taxable income of the plaintiff to $103,491.84, and having assessed a deficiency income tax in the sum of $5,632.22, the amount sought to be recovered; that this increase was based upon certain items of income omitted from the return and disallowed by the Commissioner as deductions.

The particular deduction involved in this case was the disallowance of a deduction of $32,580.12 claimed on account of various City of Spokane, Washington, improvement district bonds which the taxpayer claimed to have been ascertained to be worthless within the taxable year of 1938. According to the stipulation of facts entered into by the parties and the evidence given here before the Court, these bonds consisted of improvement bonds resting on certain real estate in the City of Spokane, State of Washington, of the par value of $50,200 for which the plaintiff paid $49,-969.75. These bonds were among various improvement district bonds in said city, issued and dated on various dates from 1909 to 1914, and maturing from 1918 to 1924. The only security for these bonds was the underlying improvement districts upon which they were a lien, and they were in no way guaranteed and were not a general obligation of the City of Spokane or any other municipal or political subdivision.

It is stipulated that there were defaults in the interest on all of these bonds prior to 1924, and they all defaulted in the payment of principal and interest as they severally matured.

These bonds were in the bank portfolio in 1924 when the plaintiff, American Bank & Trust Company, became by conversion the American National Bank, and were carried in the assets at their cost value of $49,969.75.

It appears that the national bank examiner, as a result of an examination of the bank in 1924, requested the bank to charge off part of said bonds in the amount of $25,200 par value, and this was done, and thereafter the bank carried the balance of said bonds as an asset on its books at the par value of $25,000.

In 1925 a bondholders' protective committee was formed for the purpose of attempting to effect a collection or a refund of said bonds, and the plaintiff bank in May of 1925 deposited said bonds with this committee.

In May, 1927, the balance of $24,901 par value of said bonds remaining on the books of the company after the charge-off, in 1924 $25,200 and in 1925 $99 was at the request of the bank examiner eliminated from the assets of the bank and charged off against the surplus and undivided profits of the bank. Prior to and during 1930 the bondholders' committee collected $60,000 for the benefit of the bondholders. The total amount of the bonds deposited with the committee, against which this collection was a credit, was $600,000 or $700,000 according to the testimony of Mr. Keeler, a member of the bondholders' committee.

It further appears that prior to 1924 all of the underlying property securing said bonds consisted of lots and lands that had been sold for taxes to the City of Spokane and to the County of Spokane, Washington, and the city later, in 1925, passed an ordinance which had for its purpose the refunding of said bonds. The city, however, gave up any effort to do anything in regard to these defaults in May of 1932 for the reason that sufficient bonds had not been deposited with the city to justify them in proceeding with the plan of liquidation which had been suggested.

The plaintiff took the cost of the bonds, $49,969.75, as a deduction for bad debts in its federal income tax return for 1935, and after an investigation thereof the plaintiff was notified by the Bureau of Internal Revenue that such a deduction would not be allowed and had been disallowed.

This bondholders' committee was dissolved in 1938 and the bonds returned to the plaintiff together with a check for $1531.49, representing the plaintiff's share of collections made by the committee on account of the bonds owned by the plaintiff, and in 1938 the plaintiff claimed a deduction of $32,580.12 on account of said bonds, and thereafter, under protest, paid a deficiency assessment of $5,648.82, and this suit has been brought to recover said

amount, the claim being in effect that the bonds were not ascertained to be worthless until the year 1938. It is the contention of the Government that these bonds were worthless before that date, and that for that reason the plaintiff could not claim them as a deduction for the year 1938, but should have taken the loss, if any, in its returns for previous years. The statute, subdivision (k) (1) of section 23, 26 U.S.C. A. Int.Rev.Code, provides: "Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection."

In other words, before this plaintiff could properly charge this loss off in 1938 it must have during that year ascertained the debt to have been worthless and charged it off within that taxable year. The contention of the Government is that on this record the bank should have ascertained that this was a worthless debt before that year and charged it off for a previous year, and not waited until it made its return for 1938, and it is that question that has to be resolved.

Nobody can and no one has attempted to define with any authority what a worthless debt is or when an asset of a banking institution becomes worthless. The question naturally arises what it means. Does it mean that the debt or the asset must be entirely wiped out and be of no value at all before it is worthless, or does it mean that it must be depreciated in value and have some remaining value which can be or is realized at a later date? So we have to test this question, or the question whether it was a worthless debt before 1938, by the ordinary experience and conduct of business men in their business affairs, and judge the situation by the actual facts as disclosed with respect to this particular asset.

According to the facts here recited these improvement bonds were never paid, the interest was never paid on them, and the owners of the land against which they were a lien in Spokane did not pay the taxes, and allowed them to go by default for taxes. Like all bonds of this kind, towit, improvement districts, there is no general obligation upon the taxpayers or the municipality to pay them, and unless the property owners whose property is benefited by the improvements against which the bonds were issued pay the levies, the bondholder has no recourse. All he can do is to require the proper authorities to make a levy which, if not paid by the landowners, exhausts his remedy in law, and that evidently was what occurred here, and after two or three levies had been made and nothing received thereon, it must easily have been clear to any one owning these bonds that their value and the security behind them was greatly impaired, and that a considerable loss was imminent to any institution or any person who owned them. Furthermore it appears that in the early 1920s the national bank examiner who examined this bank in accordance with his duties examined this particular asset in the portfolio of the plaintiff, and after making the examination, which we assume he did, requested that they be charged off in two successive charges one year after another. This was accordingly done. Furthermore Mr. Eckelman, a certified public accountant who was employed by the bank to make up their income tax return, questioned the value of these bonds and called attention to the matter of charging them off as against income tax before 1932. He testified he took up each issue of the bonds with the vice-president of the bank and discussed the question of charging them off. I think we may assume that in that discussion all the facts relative to their value and their default were discussed. He stated that no recovery was made on these bonds for 1924, and that after the year 1932, in 1934 and 1935, he discussed again with the officers of the bank making a claim for deduction in those particular years on the income tax return of the bank, but for some reason the officers let the matter ride along and did not make their claim until 1938. By that time the voluntary bondholders' protective committee had been organized, had gone into the matter thoroughly, and by 1938 had thrown up their hands and admitted their failure or inability to do anything in behalf of the holders of these bonds. Furthermore the bank had employed an outside party,

a Mr. Rosner, to make a separate and independent investigation in its behalf, which he did without success and so reported to the bank. By that time the bondholders' committee had dissolved and had returned the bonds to the depositors thereof with a check for a very small amount, less than one per cent or two per cent of the value of the bonds which had been collected in the meantime. .

It further appears that all these bonds were charged out of the assets of the bank in the year 1927 by order of the bank examiner, and the directors passed a resolution to that effect in that year, and thus the undivided profits of the reserves of the bank were cut by the charge against them of the investment the bank had in these particular securities.

 It seems quite apparent to the Court that for many years previous to 1938 these particular bonds had been under suspicion, and on this record, not only of the action of the bank, but of all the parties involved and the situation with respect to the bonds in Spokane, a big loss in them was impending and should have been taken long before 1938. It is very clear that they were not a good asset of the bank, and the bank itself by its actions established here that they did not consider these bonds worth anywhere near what the bank had invested in them, and that they were carried as a suspicious asset, or what has been testified to or what is called a memorandum account. That is, they were not shown in the real assets of the bank in making up its financial statement from year to year. It is therefore very clear to the Court without any further discussion that this loss had actually occurred· and the bonds had become worthless long before the year 1938, and if the bank wished to avail itself of the privilege of taking its loss on them for income tax purposes, it should have done so long before in view of the fact the bank itself had charged them off several years before, and that previous to that time, at least ten years before 1938, the bank examiner had ordered them out of the bank and had refused to permit the bank to carry them any longer as an asset. The bank examiner is well versed in matters of this kind, and' the Court is bound to take judicial notice of the fact that he is qualified and that his decision on the value of an asset or an item carried by a bank is binding not only upon the banks, but must receive the respectful consideration of the Court, and we cannot oppose our judgment, uninformed and unqualified as it is, against the judgment of the bank examiner, and say that an asset has value when the bank examiner holds to the contrary and requires the bank to take the asset out.

The Court will request the Government to prepare findings of fact and conclusions of law, and a judgment will be entered in favor of the Government and against the plaintiff.